## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| LIQUID HOLDINGS GROUP, INC., et al.,[1] | Case No. 16-10202 (___) |
| Debtors. | Joint Administration Requested |

## DECLARATION OF PETER R. KENT IN SUPPORT OF CHAPTER 11
## PETITIONS AND VARIOUS FIRST DAY APPLICATIONS AND MOTIONS

1.      My name is Peter R. Kent.  I am the Chief Executive Officer and Chief Financial Officer of Liquid Holdings Group, Inc. ("Liquid").  Liquid is a corporation organized under the laws of the State of Delaware and is the direct parent of affiliated debtor and debtor in possession Liquid Prime Holdings, LLC ("Liquid Prime" and together with Liquid, the "Debtors").  Liquid Prime is a limited liability company organized under the laws of the State of Delaware.

2.      I have been employed by Liquid since October 2014.  In my capacity as Liquid's Chief Executive Officer and Chief Financial Officer, I am familiar with the Debtors' day-to-day operations, business affairs and books and records.

3.      On the date hereof (the "Petition Date"), each of the Debtors commenced with the Court a voluntary case under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code").  Each Debtor is operating its businesses and managing its properties as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code.  Concurrently with the filing of this Declaration, the Debtors have requested that their chapter 11 cases be jointly administered for procedural purposes.

---

[1] The Debtors are the following entities (the last four digits of their respective taxpayer identification numbers follow in parentheses): Liquid Holdings Group, Inc. (2142); Liquid Prime Holdings, LLC (2135).  The address of the Debtors' corporate headquarters is 111 River Street, Ste. 1204, Hoboken, New Jersey 07030.

4.     To minimize the adverse effects of the commencement of these chapter 11 cases on their businesses, the Debtors have requested a variety of relief in "first day" motions and applications (each, a "First Day Pleading" and, collectively, the "First Day Pleadings"), filed concurrently herewith.  A list of the First Day Pleadings is attached hereto as **Exhibit A**.  I am familiar with the contents of each of the First Day Pleadings, and I believe that the relief sought therein is necessary to permit an effective transition into chapter 11.  Indeed, I believe that the Debtors' estates would suffer immediate and irreparable harm absent the immediate ability to make certain essential payments and otherwise continue their business operations as sought in the First Day Pleadings.  In my opinion, approval of the relief requested in the First Day Pleadings will minimize disruptions to the Debtors' business operations and clients, thereby preserving and maximizing the value of the Debtors' estates and assisting the Debtors in achieving a successful reorganization.

5.     This Declaration is submitted pursuant to Rule 1007 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"), and I am authorized to submit it on behalf of the Debtors.  No one individual at Liquid has personal knowledge of all of the facts set forth in this Declaration.  All facts set forth herein are based upon my personal knowledge of the Debtors' operations and finances, information learned from my review of relevant documents, and/or information supplied to me by other members of the Debtors' management and the Debtors' advisors.  If called upon to testify, I would testify to the facts set forth herein on that basis.

6.     Part I of this Declaration describes the business of the Debtors.  Part II of this Declaration discusses the developments that led to the Debtors' filing for relief under chapter 11 of the Bankruptcy Code, the prepetition marketing efforts, and related issues.  Part III of this

Declaration sets forth the relevant facts in support of the First Day Motions filed concurrently herewith.

## PART I

### Overview of the Debtors and their Operations

7.     Liquid provides a next-generation proprietary cloud-based trading and portfolio management solution that seamlessly integrates order and execution management with real-time risk management, reporting, managed services in a single platform for the financial services community.

8.     Liquid was initially formed as a Delaware limited liability company on January 17, 2012.  It commenced operations on or about April 24, 2012.  In connection with Liquid's initial public offering, it was converted to a Delaware corporation on July 24, 2013.

9.     The Debtors' corporate headquarters are in Hoboken, New Jersey.  The Debtors' corporate headquarters were formerly located in New York, New York.  Liquid subleases the New York property to a third party.  Liquid leases another office in Aventura, Florida.  Liquid leases each of these facilities and does not own any real property.

10.     As of the Petition Date, Liquid has (i) 25 full-time employees located in New Jersey, Florida, Arizona, Connecticut and North Carolina and (ii) 23 full-time consultants located in Romania and the United Kingdom.

*Liquid's Technology and Services*

11.     As a result of the financial crisis and the Dodd-Frank Wall Street Reform and Consumer Protection Act, many financial institutions exited or planned to exit proprietary trading, which caused many traders to leave those financial institutions to establish small to

3

midsized funds.  Liquid developed a cost-effective technological solution to meet these funds'

trade execution, risk management and reporting needs.

12.     Certain of Liquid's founders acquired a controlling equity interest in Green

Mountain Analytics, LLC[2], which provided a key element in Liquid's development of its trading,

reporting and administration technologies.  Liquid then acquired its risk management

technology, which was integrated with its trading, reporting and administration technologies.  Its

cloud-based software platform utilizes a core technology framework shared among all of its

components, which allows Liquid to deliver an integrated, scalable and customizable

subscription-based solution to participants in the financial services community.

13.     Liquid delivers its technology as a Software-as-a-Service, or "SaaS", solution,

which increases efficiency, reduces customer infrastructure costs and accelerates deployment.  It

uses industry standard security and encryption and hosts its core software in secure, industry

standard data centers.  Its customers include small to midsized hedge fund managers, asset

managers, wealth management offices, family offices and financial institutions.

14.     Liquid branded its trading platform as LiquidTrade[SM], its risk metrics platform as

LiquidMetrics[®], its managed services platform as Liquid Managed Services[SM] and its mobility

platform as LiquidMobile[SM].   Together, these branded platforms constitute Liquid's proprietary

cloud-based technology platform, which is fully customizable and enables customers to automate

and coordinate front-office trading functions, middle-office risk management and reporting

functions, and managed services functions.  Specifically, Liquid provides the following

technologies and services:

---

[2] Subsequent to its eventual the acquisition by Liquid, Green Mountain Analytics, LLC's name was changed to Liquid Technology Services, LLC.  On December 31, 2015, Liquid Technology Services, LLC and two other subsidiaries were merged into Liquid.

- *Trading Technology.* Liquid's proprietary trading technology, LiquidTrade[SM], is a next-generation, single order and execution management application (OEMS), integrating the speed, workflow and trading tools of a broker-neutral execution management system (EMS) with true order management system (OMS) capabilities. The trading technology creates a seamless trading lifecycle management in a single system with low latency electronic and algorithmic trading and real-time (pari passu) and post-trade allocations. It is FIX integrated with all tier one and many other executing brokers for global execution. The trading technology enables automated distribution of order flow to multiple executing counter-parties and has advanced holding structure architecture and multi-asset, multi-currency, position aware execution. It creates real-time profit and loss (P&L) reports using Greek letters and has net asset value (NAV) and account-capital-based order generation and allocation schemas. It also has the ability to block trades in real-time. The trading technology creates a centralized user management system and contains an extensive application programming interface (API) library. In addition, Liquid is in late stages of developing an OMS staging, trader assignment and portfolio management capabilities.

- *Risk Management Technology.* Liquid's proprietary risk management technology, LiquidMetrics®, is a real-time portfolio and risk analytics engine delivered through a next-generation, tablet-optimized user interface. The risk management technology has extensive portfolio management and options analytics and historical and predictive scenario and sector analysis. It enables customizable stress testing, benchmarking and investor tear sheets. It also has liquidity and

5

exposure, position level P&L and strategy, and counter-party reporting functions. The risk management technology can evaluate value at risk (VaR) using parametric, historical and Monte Carlo methodologies.  It is also able to track trading confirms, pending dividends, short stock interest, and fees and rebates. Extensive APIs allow third parties to interface with the analytics engines.

- *Managed Services and Reporting Technology*.  Liquid's proprietary managed service platform, Liquid Managed Services[SM], is designed to enable firms to rapidly scale their business and minimize headcount needs in operations.  The managed service technology performs comprehensive daily trade and position reconciliation and full start-of-day and end-of-day file management and delivery on behalf of individual funds.  It is a managed security master on behalf of clients and includes data management to ensure fund accuracy.  It enables customers to quickly on-board new locations, users, and portfolio products and has shadow NAV verification.  The managed services technology is also integrated with all tier 1 and tier 2 clearing and fund administration firms.

- *Mobility Technology*.  Liquid's proprietary mobility platform, LiquidMobile[SM], is a cross-platform, user interface optimized for mobility and device independence to support Liquid's real-time reporting and data presentation paradigm.  It has a centralized notifications server and interfaces with API controlling in-bound and out-bound messages.  The mobility technology has extensible dashboards and native reporting to accommodate any level of data and supporting drill-downs.  It enables access to Liquid's library of returns and risk statistics to create custom

reports that address the most specific mandate. It also has an investor presentation mode for marketing purposes.

- *Customer Support*. Liquid offers full-time multi-tier support services to its customers to assist in the successful implementation of the Liquid platform and to optimize customers' use of the Liquid platform during the terms of their subscription contracts. Liquid utilized remote access, system diagnostic and network traffic analyzing tools to quickly pinpoint and resolve support requests allowing staff to diagnose issues remotely and economically.

- *Research and Development*. Liquid's research and development department is responsible for product management, product development, quality assurance and technology operations. The research and development department is located primarily in Liquid's Aventura, Florida office, supported by developers operating on a contract basis located in Romania and the United Kingdom.

15.    Liquid registered Liquid Holdings Group®, LiquidMetrics®, LiquidTrade^SM, Liquid Managed Services^SM, and LiquidMobile^SM as service marks and/or trademarks with the U.S. Patent and Trademark Office, or USPTO. Liquid has developed and owns proprietary software to operate its integrated technology platform, which is protected under copyright law and trade secret law. In addition, Liquid licenses certain commercially available software. Liquid has also filed an omnibus utility patent application with the USPTO with respect to its integrated technology platform with trade execution, risk management, managed services and reporting capabilities. To date, no patent has issued under this application.

*Liquid's Customers*

16.     Liquid offered its cloud-based platform in two ways: through a direct sales force and through strategic partner relationships.  Direct sales were primarily focused on hedge funds and other asset managers who sought cost efficient trading and risk management technology. Institutional sales were focused on financial institutions seeking to reduce their technology, infrastructure, and support expenditure by outsourcing software development related to trade execution, risk management, and managed services and reporting both internally and to their customers.  Direct customer revenue is earned through subscription fees.  Institutional revenue is earned through subscription fees, integration and customization fees, and hosting and gateway fees.

17.     Since its inception, Liquid relied significantly on the revenues generated by a single customer, QuantX Management, LLP (collectively with its affiliates, "QuantX").  QuantX was a related party as a result of certain past or present relationships with Brian Ferdinand, Robert Keller and Richard Schaeffer (the founders of Liquid) and Douglas J. Von Allmen (a holder of more than 5% of Liquid's common stock).  QuantX operated as a principal-only trading firm domiciled in the United Kingdom trading solely for its own account.  QuantX was a customer of Liquid's technology platform, which it then marketed to its own members, thereby providing Liquid with a source of customer referrals.  On December 23, 2014, Liquid notified QuantX that it was delinquent in payments owed to the company in the aggregate amount of approximately $1,400,000.00 pursuant to two technology services agreements and approximately $325,000.00 in additional delinquent payments and demanded that QuantX pay such amounts immediately.  Shortly thereafter, QuantX and all of the customers that had been generated as a

result of Liquid's relationship with QuantX ceased being Liquid's customers.  Upon information and belief, QuantX ceased its operation on or about December 31, 2014.

18.    Liquid's current customer base is small.  As of January 14, 2016, Liquid had approximately 10 customers, which customers are located in the United States and Europe.  Its typical customer contract has a one-year term, billed monthly and renewing automatically for successive one-year terms, unless notice of termination is given at least 60 days prior to the contract's expiration date.

*Debtor Liquid Prime Holdings, LLC*

19.    Liquid Prime is a Delaware limited liability company that was formed on September 22, 2011 to hold the equity of Liquid Prime Services, Inc. ("LPS"), which was a United States broker-dealer.  On June 1, 2013, LPS, along with Liquid's United States independent introducing broker, Liquid Futures, LLC[3] ("Futures"), and its United Kingdom brokerage company, Liquid Trading Institutional LLP ("Institutional"), a United Kingdom limited partnership, ceased their over-the-counter brokerage operations.  While these entities were intended to provide ancillary execution services for Liquid's technology platform customers, they did not handle customer funds, provide clearing services, or participate in any proprietary trading ventures.

20.    The United Kingdom Financial Conduct Agency (the "FCA") granted Institutional's request to withdraw as an FCA-authorized entity effective as of October 24, 2014.  Institutional will be stricken as an entity by the FCA on or about April 15, 2016.

---

[3] Effective February 12, 2014, Liquid received regulatory approval to consolidate LPS and Futures, with LPS remaining as the surviving entity.

144713.00101/101791579v.4

21.     On or about March 10, 2015, Liquid Prime entered into a sale agreement with respect to LPS and the sale of LPS closed on September 4, 2015.  Liquid Prime indemnified the purchaser of LPS' stock.

*Public Offerings and Equity Holders*

22.     The Debtors' operations have been financed primarily through private and public sales of its equity securities.  On July 31, 2013, Liquid closed its initial public offering of 3,175,000 shares of common stock (the "IPO"), the offer and sale of which were registered under the Securities Act of 1933, as amended (the "Securities Act"), pursuant to a registration statement on Form S-1 (File No. 333187859).  Effective upon Liquid becoming a corporation on July 24, 2013, all common units of Liquid outstanding automatically converted into shares of common stock.  The offering did not terminate until after the sale of all of the shares registered on the registration statement.  Sandler O'Neill & Partners, L.P. acted as the underwriter.  The public offering price of the shares sold in the offering was $9.00 per share.  Liquid received net proceeds in the initial public offering of approximately $17.3 million after deducting underwriting discounts and commissions of approximately $ 2.6 million and offering related expenses of approximately $8.7 million.

23.     On May 20, 2014, Liquid completed a follow-on public offering in which 32,000,000 shares of its common stock were sold at a public offering price of $1.25 per share.  On May 27, 2014, the underwriters for this offering partially exercised their overallotment option and purchased an additional 2,945,000 shares of Liquid's common stock at $1.25 per share.  Liquid received net proceeds from this offering of approximately $39.5 million after deducting underwriting discounts and commissions of approximately $3.1 million and offering related expenses of approximately $1.1 million.

24.     As of the Petition Date, there were 60,696,879 shares of common stock outstanding.  Upon information and belief, stockholders holding more than 5% of Liquid's outstanding common stock beneficially own 17,565,606 shares, or approximately 29% of outstanding shares, as of January 15, 2016.   Directors and officers beneficially own 1,188,767, or approximately 1.96% of outstanding shares, as of January 15, 2016.[4]  As of January 15, 2016, Liquid had approximately 46 registered holders of record of its common stock.[5]

25.     Liquid's common stock trades in the over-the-counter market.  Prior to October 2015, the common stock had been listed on the national markets operated by The Nasdaq Stock Market LLC ("NASDAQ").  As discussed more fully-below, NASDAQ suspended and eventually delisted Liquid's common stock.

*Current Financials*

26.     As of the Petition Date, the Debtors' assets are comprised of their intellectual property, notes, legal claims and cash in the approximate amount of $1,104,019.56, subject to a reserve for certain wind down insurance costs.  Liquid also owns the equity interests in three foreign non-debtor entities: (i) Institutional; (ii) LHG Technology Services Ltd., a Mauritius corporation ("Mauritius"); and (iii) Liquid Investment Consulting (Shanghai) Co., Ltd., a Chinese corporation wholly owned by Mauritius.[6]  The Debtors have no secured debt.  The

---

[4] This figure does not include the shares of Liquid common stock corresponding to: (i) 82,169 vested but undelivered restricted stock units ("RSUs") issued under Liquid's 2012 Amended and Restated Stock Incentive Plan (the "2012 Plan"); (ii) 307,658 unvested RSUs and stock options issued under the 2012 Plan; (iii) 193,414 vested but out-of-the-money options issued under the 2012 Plan; and (iv) 1,000,000 out-of-the-money stock options that were issued as an inducement grant, 333,333 of which have vested.

[5] The actual number of stockholders is greater than these numbers of record holders, and includes stockholders who are beneficial owners, but whose shares are held in "street name" by brokers and other nominees.  The number of holders of record also does not include stockholders whose shares may be held in trust by other entities.

[6] None of these entities have ever had any operations and currently hold *de minimis* assets.  As noted above, Institutional is currently scheduled to be dissolved on or about April 15, 2016.

Debtors estimate their unsecured trade debt totals approximately $803,780.68.  The Debtors may

have contingent liabilities of various sorts.

**PART II**

**Events Leading to Chapter 11 and Plan of Liquidation**

*The Audit Committee Investigation and Grant Thorton*

27.     On March 31, 2015, Liquid filed a Notification of Late Filing (Form 12b-25) with

the Securities and Exchange Commission (the "SEC") wherein it stated it was unable to file its

Annual Report on Form 10-K for the fiscal year ended December 31, 2014 (the "2014 Annual

Report") within the time period required by the Securities Act.  Due to an investigation (the

"Investigation") by the Audit Committee (the "Audit Committee") of Liquid's Board of

Directors (the "Board") into certain issues raised by counsel to one of Liquid's stockholders,

including allegations about Liquid's former senior management, Liquid was unable to deliver

materials to its independent registered public accounting firm, Grant Thornton LLP ("Grant

Thornton"), with sufficient time for Grant Thornton to complete their audit of Liquid's

consolidated financial statements for the fiscal year ended December 31, 2014 ("2014 Financial

Statements") prior to the filing deadline for the 2014 Annual Report.

28.     Liquid's outside counsel, Gibson, Dunn & Crutcher LLP ("Gibson Dunn")

assisted the Audit Committee with the Investigation.  Upon the completion of the Investigation,

Grant Thornton requested that Gibson Dunn expand the scope of the Investigation.  When

Gibson Dunn delivered a subsequent report outlining the results of the expanded Investigation,

Grant Thornton took the position that Gibson Dunn was not sufficiently independent to conduct

the Investigation and requested that independent legal counsel be engaged to assist the Audit

Committee in conducting the Investigation.  The Audit Committee then engaged Ballard Spahr

144713.00101/101791579v.4

LLP ("Ballard Spahr").  The results of Ballard Spahr's investigation were communicated to the

Audit Committee and Grant Thornton on July 27, 2015, and, at that time, Grant Thornton

indicated that the results of the Investigation were acceptable to it and that it saw no obstacle to

completing its audit of the 2014 Financial Statements or issuing its audit report thereon.  At

Grant Thornton's request, and although no additional investigative work was requested or

required, Ballard Spahr's consultant finalized its analysis on September 14, 2015, after Ballard

Spahr received two clarifying comments to its consultant's work on September 11, 2015.

29.     As a result of the Investigation, on September 10, 2015, the Audit Committee and

the Board concluded that Liquid's previously issued unaudited condensed consolidated financial

statements as of September 30, 2014 and for the three and nine months ended September 30,

2014 (the "Restatement Period") should no longer be relied upon and should be restated due to

certain accounting errors (the "Restatement").  The accounting errors involve the premature

recognition of revenue from QuantX and QuantX-related customers during the quarter ended

September 30, 2014, before collectability was reasonably assured, given the significance of the

uncertainty of collections from QuantX and QuantX-related customers that became known to

certain members of management during June 2014.

30.     On September 15, 2015, when Liquid was prepared to file: (i) its amended and

restated Quarterly Report on Form 10-Q/A for the quarter ended September 30, 2014 to reflect

the results of the Restatement (the "Restated September 30 Form 10-Q"); (ii) its 2014 Annual

Report; and (iii) its Quarterly Report on Form 10-Q for the quarter ended March 31, 2015 (the

"March 31 Form 10-Q") with the SEC, Grant Thornton informed Liquid, for the first time, that it

would not issue its audit report in respect of the 2014 Financial Statements that were to be

included in the 2014 Annual Report and that it would not review the Restated September 30

144713.00101/101791579v.4

Form 10-Q or the March 31 Form 10-Q.  In addition, Grant Thornton demanded the final

payment with respect to its services on September 14, 2015 as a condition to delivering its report

with respect to the 2014 Financial Statements, which payment was promptly made by the

Company on September 15, 2015, hours before Grant Thornton informed Liquid of its refusal to

issue its audit report.

31.    On September 16, 2015, Liquid filed a Current Report on Form 8-K with the SEC

(i) stating that investors should no longer rely upon its previously filed financial statements and

other financial data for the Restatement Period or any press releases or other communications

that relate to that information and (ii) setting forth estimated adjustments that Liquid

preliminarily anticipated to make to its unaudited financial statements for the Restatement Period

as a result of the Restatement.

32.    On September 18, 2015, Grant Thornton notified Liquid that it was resigning as

Liquid's independent registered public accounting firm effective immediately.  On September

21, 2015, Liquid received a letter from Grant Thornton stating that it had terminated its services

to Liquid and resigned from its engagement to audit the 2014 Financial Statements and to

perform related interim reviews due to "a number of unexpected circumstances that [had] arisen

since" the date of their engagement letter, as amended.

33.    Liquid believes Grant Thornton: (i) failed to fulfill its professional obligations and

duties to Liquid as its client in performing the services, and (ii) breached obligations and

promises it made in its engagement letter, as amended, with Liquid.  In addition, Liquid believes

Grant Thornton's resignation under the circumstances described above amounts to Grant

Thornton's unjust enrichment and should result, at a minimum, in Grant Thornton's

disgorgement of approximately $1 million in fees paid to it by Liquid during 2015.

14

34.     Though Grant Thornton did not formally deliver its audit report with respect to the 2014 Financial Statements, the draft of such report that Grant Thornton presented to Liquid on September 15, 2015 in connection with the preparation of the 2014 Annual Report did not contain any adverse opinion or a disclaimer of opinion, nor was such report qualified or modified as to uncertainty, audit scope, or accounting principles, except that such report contained an explanatory paragraph which noted that the Company's recurring losses from operations and termination of its relationship with QuantX raised substantial doubt about the Company's ability to continue as a going concern.

35.     Except as set forth above, there had been no disagreements with Grant Thornton on any matters of accounting principles or practices, financial statement disclosure or auditing scope and procedure which, if not resolved to the satisfaction of Grant Thornton, would have caused Grant Thornton to make reference to the matter in its expected report on the Company's 2014 Financial Statements.  There were no reportable events (as that term is defined in Item 304(a)(1)(v) of Regulation S-K under the Securities Act) except that Grant Thornton identified the Restatement as evidence of a continuing material weakness in Liquid's policies, procedures and controls to identify, authorize, approve, monitor and account for and disclose related party transactions and arrangements, including those transactions outside the normal course of business, in the financial statements in accordance with GAAP.

36.     The Audit Committee has not appointed a new independent registered public accounting firm.  In addition to not filing its 2014 Form 10K, Liquid has been unable to file its quarterly reports on Form 10-Q for the first three quarters of 2015.  However, Liquid has released, via current reports on Form 8-K, unaudited financial information for 2014 and

unreviewed financial information for the Restatement Period and for each of the first two
quarters of 2015.

*Securities-Related Events*

37.    On January 22, 2015, Liquid received a letter from the staff of NASDAQ's
Listing Qualifications Department (the "Listing Department Staff") stating that, for the last 30
consecutive business days, the bid price for Liquid's common stock had closed below the
minimum $1.00 per share requirement under NASDAQ Listing Rule 5450(a)(1) (the "Minimum
Bid Requirement").  Liquid's deadline to regain compliance with the Minimum Bid Requirement
was January 19, 2016.

38.    On September 21, 2015, Liquid received a letter (the "Delisting Notice") from the
Listing Department Staff notifying it that trading in Liquid's common stock would be suspended
at the opening of business on September 30, 2015 and a Form 25 would be filed with the SEC,
which would remove Liquid's securities from listing on The NASDAQ Capital Market.

39.    Liquid had previously received Listing Department Staff letters, dated April 16,
2015, May 19, 2015, and August 20, 2015, notifying Liquid that it was no longer in compliance
with NASDAQ Listing Rule 5250(c)(1) because it had not filed with the SEC its: (i) 2014
Annual Report; (ii) March 31 Form 10-Q; and (iii) its Quarterly Report on Form 10-Q for the
quarter ended June 30, 2015, respectively.  Based on its review of Liquid's compliance plans, the
Listing Department Staff granted Liquid an exception, until September 15, 2015, to file its 2014
Annual Report and March 31 Form 10-Q with the SEC and thus regain compliance with Rule
5250(c)(1) with respect to those filings.  However, because Liquid did not file its delinquent
2014 Annual Report and March 31 Form 10-Q with the SEC on or prior to September 15, 2015,
the Listing Department Staff determined that Liquid had not met the terms of the exception.  In

16

addition, the Listing Department Staff was notified that Grant Thornton resigned as Liquid's independent registered public accounting firm.  In light of the foregoing, the Listing Department Staff believed that Liquid was not in a position to file the delinquent periodic reports with the SEC by October 12, 2015, which represented the staff's maximum discretion under NASDAQ rules, and sent the Delisting Notice described above to Liquid.

40.    Although Liquid appealed the Delisting Notice, it subsequently withdrew its appeal.  It then received a notification letter from the Listing Department Staff, dated October 26, 2015, stating that Liquid's common stock would be suspended from trading on The NASDAQ Capital Market at the open of business on Wednesday, October 28, 2015.  The Listing Department Staff also informed Liquid that the Form 25 (Notification of Delisting) would be filed with the SEC when all internal appeal periods had run.

41.    Liquid also received a document preservation notice dated March 19, 2015 from the staff of the SEC requiring that it preserve documents in connection with an ongoing investigation being conducted by the staff (the "SEC Investigation").  In connection with the SEC Investigation, Liquid has received requests for documents from the staff of the SEC and is voluntarily producing the requested documents.

*Litigation*

42.    On August 18, 2015, Jay Deutsch, as Managing General Partner of the Deutsch Family Investment Partnership, and Todd Deutsch filed an action (the Deutsch Matter") in the Supreme Court of the State of New York, County of Nassau (*Jay Deutsch as Managing General Partner of The Deutsch Family Investment Partnership and Todd Deutsch v. Liquid Holdings Group, Inc. f/k/a Liquid Holdings Group, LLC, Brian Ferdinand, Richard Schaeffer, Ferdinand Holdings, LLC, Schaeffer Holdings, LLC, Brian Storms, and John Does I-*X, Index No.

17

605359/2015) against the following defendants: Liquid; two of Liquid's founders, Brian

Ferdinand (Liquid's former Vice Chairman of the Board of Directors and Head of Corporate

Strategy) and Richard Schaeffer (a former director), and their respective affiliates; and Brian

Storms, a former director as well as Liquid's former Vice Chairman and Chief Executive Officer

(collectively, the "Deutsch Action Defendants").  The complaint alleges that the Deutsch Action

Defendants made misrepresentations in connection with the plaintiffs' investment in Liquid.  The

plaintiffs asserted two causes of action seeking damages of up to $1,250,000, plus punitive

damages, prejudgment interest and costs of the litigation.  The motions to dismiss filed by Liquid

and certain of the other Deutsch Action Defendants are scheduled to be heard on February 10,

2016.

    43.    On September 21, 2015, a securities class action complaint (the "2015 Class

Action") was filed against Liquid, certain of its former and current officers and directors and the

underwriter of Liquid's initial public offering (collectively, the "Class Action Defendants") in

the United States District Court for the District of New Jersey (*Robert De Vito v. Liquid

Holdings Group, Inc. et al.,* (No. 2:15-cv-06969-KMJBC)).  The named plaintiff's complaint

brings claims on behalf of a putative class consisting of all persons, other than the Class Action

Defendants and other officers and directors of Liquid, who purchased or acquired shares of

Liquid's common stock: (i) pursuant and/or traceable to the our registration statement and

prospectus filed with the SEC in connection with the IPO and/or (ii) between July 26, 2013 and

December 23, 2014.  The complaint asserts claims for alleged violations of: (i) Section 11 of the

Securities Act; (ii) Section 15 of the Securities Act; (iii) Section 10(b) of the Securities Exchange

Act of 1934, as amended (the "Exchange Act") and Rule 10b5 promulgated thereunder; and (iv)

Section 20(a) of the Exchange Act.  As relief, the complaint requests compensatory damages in

an unspecified amount and reasonable costs and expenses, including counsel and expert fees.

Liquid's response to the securities class action complaint is not yet due.

*Restructuring Efforts*

44.     Liquid has a history of operating losses and negative cash flow and it has

generated modest revenue to date.  In addition, it has incurred and expects to continue to incur

significant legal expenses associated with the Investigation, terminating its relationship with

QuantX and other matters.

45.     In order to address Liquid's recurring losses and the need for additional liquidity,

on September 22, 2015, the Board authorized Liquid's management to explore various strategic

alternatives, including, but not limited to: (i) the sale of all or substantially all of Liquid's assets;

(ii) obtaining debt or other financing to continue operations; or (iii) a financial reorganization,

liquidation, or cessation of operations.

46.     Also, on September 22, 2015, in light of the Board's decision to authorize the

Liquid's management to review strategic alternatives and Liquid's need to conserve working

capital, the Board approved certain restructuring actions.  Accordingly, Liquid significantly

reduced its sales and marketing and operational technology staff, which reduction completed

effective September 23, 2015 and involved 13 employees and 2 fulltime equivalents at Liquid's

third-party service providers, or approximately 22% of Liquid's workforce.

47.     These restructuring actions, coupled with its efforts in July 2015 to increase

operating efficiencies and reduce its cost structure, reduced Liquid's operating costs but also

resulted in certain charges, primarily related to severance payments and other exit costs.

48.     On November 25, 2015, Liquid retained Carl Marks Advisory Group LLC to

assist with its restructuring efforts.

144713.00101/101791579v.4

*Prepetition Marketing*

49.     On or about October 27, 2015, the Board authorized Liquid to retain SenaHill

Advisors, LLC ("SenaHill"), an investment banker firm specializing in financial technology

companies like Liquid, to explore strategic alternatives, including, but not limited to, a merger or

other business combination, a sale of all or substantially all of Liquid's assets or other

transaction.  Since its retention, SenaHill has contacted 98 parties, established a virtual data room

for due diligence purposes and facilitated meetings with Liquid's management and several

interested parties.

50.     While certain parties have indicated that they may be willing to bid at an auction

for the purchase of Liquid's assets, at least one party remains interested in serving as a stalking

horse purchaser and debtor-in-possession lender.  Liquid is actively engaging in discussions with

that party.  If Liquid is able to secure a stalking horse bid and a financing commitment, it will

file the necessary motions seeking appropriate relief on an expedited basis.

*The Chapter 11 Cases*

51.     Liquid has considered its options carefully.  It has filed these chapter 11 cases in

order to preserve the ability to realize maximum value from its assets.  The Debtors will continue

to market their assets in an effort to generate sale proceeds that will be available for distribution

to their stakeholders.  While it believes that its going concern retains important value, based on

the progress to date with the marketing process and its limited liquidity, Liquid has limited time

to secure financing and consummate a sale transaction.

52.     The Debtors are also focused on organizing and preserving their business records

and a static, escrowed version of their intellectual property assets so that the Debtors are in a

144713.00101/101791579v.4

position to cooperate with the SEC Investigation and to defend the 2015 Class Action, the

Deutsch Matter and any other matters that may arise.

## PART III

### The Debtors' First Day Pleadings

53.     To enable the Debtors to minimize the adverse effects of the commencement of

these chapter 11 cases on their ongoing business operations and to promote a smooth transition

to operations in chapter 11, the Debtors have requested various relief in their First Day

Pleadings.  The First Day Pleadings seek authority to, among other things, maintain the morale

of the Debtors' remaining employees and contractors and ensure the continuation of the

Company's cash management systems and other business operations without interruption.

Receiving Court approval of the relief sought in the First Day Pleadings is essential to

maximizing the value of the Debtors' assets for the benefit of their estates and creditors.

54.     Two of the First Day Pleadings requests authority to pay certain prepetition

claims.  Rule 6003 of the Federal Rules of Bankruptcy Procedures provides, in relevant part, that

the Court shall not consider motions to pay prepetition claims during the first 20 days following

the filing of a chapter 11 petition, "except to the extent relief is necessary to avoid immediate and

irreparable harm."  In light of this requirement, the Debtors have narrowly tailored their requests

for immediate authority to pay certain prepetition claims to those circumstances where the failure

to pay such claims would cause immediate and irreparable harm to the Debtors and their estates.

Other relief will be deferred for consideration at a later hearing.

144713.00101/101791579v.4

55.    I have reviewed each of the First Day Pleadings.  The facts stated therein are true and correct to the best of my information and belief, and I believe that the relief sought in each of the First Day Pleadings is necessary to enable the Debtors to operate in chapter 11 with minimal disruption to their business operations and constitutes a critical element in successfully preserving the value of the Debtors' businesses.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 27, 2016

By: _____
Name:  Peter R. Kent
Title:  Chief Executive Officer and
Chief Financial Officer of
Liquid Holdings Group, Inc.,
which is the sole member of
Liquid Prime Holdings, LLC

## <u>EXHIBIT A</u>

**List of First Day Pleadings**

1.  Debtor's Motion for Entry of an Order Directing the Joint Administration of the Debtors' Chapter 11 Cases [Docket No. 3]

2.  Motion of the Debtors for Entry of an Order Authorizing the Continued Use of the Debtors' Cash Management System, Existing Bank Accounts and Business Forms [Docket No. 4]

3.  Debtors' Motion for Entry of an Order Authorizing Debtors to Pay Prepetition Wages, Compensation, and Employee Benefits [Docket No. 5]

4.  Motion of the Debtors to Authorize the Payment of Prepetition Taxes and Related Obligations; and Continue Such Payments Postpetition in the Ordinary Course of Business [Docket No. 6]